# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

ROSETTA ALONCI, *et al.*,

                                     Plaintiffs,

-vs-

INTERNATIONAL UNION OF ELECTRONIC,
ELECTRICAL, SALARIED, MACHINE &
FURNITURE WORKERS, AFL-CIO, and its LOCAL
509 (IUE-CWA, LOCAL 509),

                                     Defendants.

DECISION AND ORDER
05-CV-6608   CJS

## APPEARANCES

For Plaintiffs:

Jennifer L. Fazio, Esq.
Kaman, Berlove, Marafioti, Jacobstein &
Goldman
135 Corporate Woods Suite 300
Rochester , NY 14623
(585) 325-7440

Donna Marianetti, Esq.
51 Neuchatel Lane
Fairport, NY 14450
(585) 223-2820

For Defendants:

Matthew J. Fusco, Esq.
Chamberlain, D'Amanda, Oppenheimer &
Greenfield, LLP
1600 Crossroads Building
Two State Street
Rochester, NY 14614
(585) 232-3730

## INTRODUCTION

This matter involves a collective bargaining agreement and allegations of a breach of the duty of fair representation on the part of the International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers, AFL-CIO, and its Local 509 (IUE-CWA, Local 509) (collectively hereinafter referred to as "Union"). It is before the Court on Defendants' motion for summary judgment (Docket No. 39). For the reasons stated below, Defendants' application is granted.

## FACTUAL BACKGROUND

This case is joined with 29 others in which Plaintiffs allege similar wrongful conduct on the part of Defendants. Plaintiff's counsel states in her memorandum of law that,

> In total, the undersigned plaintiffs' counsel filed thirty (30) substantially [similar], though not identical, Complaints against the Union. The plaintiffs fall into two categories: (1) those, such as Mr. Zagari, who were actively employed by Valeo and were members of the Union at the time of [sic] the September, 2005 ratification vote took place; and (2) Those, such as plaintiff Alonci, who separated their employment within a short time prior to the September, 2005 amendment pursuant to the terms of the May, 2002 amendment to the Collective Bargaining Agreement.

(Pl.s' Mem. of Law (Docket No. 52) at 2.) One plaintiff, Charles Kaiser, voluntarily withdrew his action, leaving the current 29 plaintiffs. (*Id.*) The Court previously addressed Defendants' motion to dismiss and permitted Plaintiffs to amend their complaint. Defendants' second motion to dismiss the amended complaint was unsuccessful.

The salient facts are not in dispute. The lead plaintiff[1] in the Alonci group, Rosetta Alonci ("Alonci"), was employed by Valeo Corporation ("Valeo") as an assembly worker, commencing on or about November 28, 1988, and ending on or about June 6, 2005. During her employment with Valeo, she was a member of the Union. On or about July 20, 2000, the Union and Valeo negotiated the terms of a collective bargaining agreement[2] which was ratified and deemed to go into effect on August 14, 2000, and expire on July 31, 2008. (Joseph Giffi ("Giffi") Aff. (Docket No. 46) ¶ 23.)  Shortly after signing the contract, Valeo wanted to make major changes to reduce the wage scale. The Union refused, and, on  December 14, 2001, Valeo filed for bankruptcy protection. (*Id.* ¶ 27–28.) Subsequent to Valeo's bankruptcy filing, the Union reached what it termed a "concessions contract." (*Id.* ¶ 34.) This concessions contract contained a lay off schedule covering the years 2002 through 2005 and limited the number of employees Valeo could lay off each year. Further, it added two more retirement acceleration programs ("RAP") in addition to the RAP negotiated in the 2000 contract. (*Id.* ¶¶ 35–36.) As described by Giffi, formerly President, Financial Secretary, and Benefits Representative for defendant Local 509 and then as Director of Region 3 of the defendant International Union of Electrical Workers — Communications Workers of America:

---

[1]As further detailed below, there are two groups of plaintiffs with similar factual settings. Alonci is the lead of one group.

[2]The collective bargaining agreement states in relevant part, "AGREEMENT entered into this, 20th day of July, 2000, between Valeo Electrical Systems, Inc.… And the International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers, AFL-CIO, and its Local 509, hereinafter referred to as the 'Union.'" (Agreement (Aug. 14, 2000), at 3 (attached as Ex. E to Fusco Aff.) Accordingly, the Court will use "Union" primarily to refer to both the local and the international unions, except where a distinction is necessary.

> There was now a retirement incentive which provided cash incentive to those people already eligible for a full pension and a voluntary attrition program (VAP) which provided $75,000.00 to any employee who, although not pension eligible, would simply agree to be laid off out of seniority. These individuals would of course be entitled to a deferred vested pension when they reach retirement age.

(Giffi Aff. ¶ 36.) The Union provided its members with a highlight booklet to explain the changes contained in the 2002 agreement and sent it to every Union member prior to ratification of the 2002 agreement. (*Id.* ¶ 39.)

In July 2005, Valeo announced it was shutting down its Rochester, New York plant by July 31, 2008, the end of the collective bargaining agreement. (*Id.* ¶ 46.) Giffi, who was by then serving the International Union, worked with David Roehrig ("Roehrig"), his replacement as President of the Local Union, to negotiate with Valeo regarding the plant closing. (*Id.* ¶ 47.) According to Giffi, he and Roehrig at first attempted to keep the plant open through concessions, and they asked to see detailed financial records of the corporation. (*Id.* ¶ 48–49.)

In the amended complaint,[3] Plaintiffs allege that between January and March 2005, the Union informed Alonci and other employees that they should use voluntary attrition programs, because if enough people did not sign up, there would be involuntary terminations. (Am. Compl. ¶ 17.) Plaintiffs also allege that a number of employees, including Alonci, were repeatedly told that the likelihood of layoff was high and that they should "take the attrition program (the 2002) and that it was the best thing going." (Pl.s' Aff. (Docket No. 50-14) ¶ 19.) Plaintiffs cite to Roehrig's deposition testimony in their memorandum of law to support their contention that, "[t]he Union, despite its denials, was

---

[3]The amended complaint is not verified and is signed only by counsel.

clearly in discussions of some sort with the company dating back to at least early March, 2005 regarding possible future incentive plans for attrition" and "was aware of the strong possibility of plant closure." (Pl.s' Mem. of Law at 5–6.)

On the issue of layoffs, Roehrig testified as follows:

Q. I'd [sic] ask you to take a look at the complaint please.

A. Yes, I've read that.

Q. Keep it in front of you because I'm going to be asking you some questions. Could you please turn to page 4, paragraph seventeen?

The first sentence of the paragraph says, "In or about the early spring months of 2005 employees, including plaintiff, were informed by the union that voluntary attrition programs should be used because if enough people didn't sign up there would be involuntary terminations."

Is that statement factual to your knowledge?

A. Well, there was definitely an attrition program in place with numbers provided by the company and if not enough volunteered there wouldn't be what they call a TAP, which is termination program as opposed to VAP which is voluntary. Yes, that's the case.

Q. The plaintiffs say these representations were made by you and Mark Moochler.[4] I'm asking in respect to you if you ever told any of the plaintiffs in this action that they should sign up because they could be laid off?

A. I've never told anyone they should or shouldn't.

Q. Did you have any communications with any of these plaintiffs during this [sic] January, 2005 to March, 2005 in regard to the voluntary attrition program?

A. Yes I walked the plant on a regular basis, explained the program, explained how many people have signed up, trying to make sure everyone was well-informed.

---

[4]Mark Moochler ("Moochler") was the Shop Chairman for Local 509.

Q. During those discussions did you ever tell anyone where they were on the lay-off list?

A. Yes. I published it in leaflets also.

Q. For what purpose did you do that?

A. So people could make in education—educated decision on whether they should or shouldn't sign up based on their situation.

Q. By educated decision, do you mean fully informed?

A. Yes. They had to be fully informed of the sign-up procedure, sure….

Q. [W]hy did you tell them where they were on the list?

A. That's part of the sign-up procedure, the total numbers. I'm referring to the sign-up procedure as the number for attrition and how many have signed up how many would possibly be tapped. Yeah, I did that….

Q. So we have determined that you told them about how many people have signed up, right?

A. Yes.

Q. You told them how many people were needed?

A. Yes.

Q. And you told them where they were on the list for lay-off, right?

A. No, not lay-off. This had nothing to do with lay-offs. This is for attrition.

Q. Did you tell them where they were based on seniority if they were likely to be laid off or not?

A. There was no lay-off tied to attrition. There was VAP or TAP.

Q. If they didn't get enough volunteers is it accurate that would have had involuntary lay-off?

A. That would be a TAP program. There was not a contractual lay-off.[5] There was [sic] no lay-offs involved....

Q. Do you tell any of the plaintiffs or the individuals out on the floor as you've stated where they fell in terms of seniority and how likely it would or wouldn't be that they would be involuntarily terminated?

A. I used strictly mathematics; the numbers period. No likelihoods, no if it comes. Strictly mathematics.

(Roehrig Dep. 44:6–48:6.)

On the issue of plant closure, at his deposition, Roehrig testified as follows:

Q. Did you attend any meetings with any company representatives from January 1st, 2005 through July 2005?

A. Yes, I did.

Q. At any of those meetings was plant closure discussed?

A. The possibility of it was. But it was never committed to by the company.

(Roehrig Dep. 12:18–25.) Roehrig further testified:

Q. If someone said to you during that time, if someone had come to you during that time and said hey, Dave, I heard that the company has been bantering around the possibility of closing. Have you heard anything about that? Would you have told them [sic] if you had heard that?

A. My standard answer was don't believe rumors. Everything I say will be factual.... I don't comment on rumors.

(*Id*. at 49:6–49:15.) However, Plaintiffs' counsel never questioned Roehrig more specifically about when such discussion occurred in relationship to any inquiries from Plaintiffs. In other words, the Alonci Plaintiffs have not come forward with any evidentiary proof in admissible form establishing that Roehrig was aware of the possibility of the plant closing

---

[5]Plaintiffs' counsel later used the term, "involuntary termination," and Roehrig agreed with that characterization. (Roehrig Dep. at 47:18–20.)

before they accepted the 2002 attrition agreement in March of 2005, only that he was aware of it sometime between January and July of 2005.

In fact, the evidentiary proof in admissible form suggests that Roehrig was not aware of the possibility of the plant closing in March of 2005.[6] In that regard, he testified that during a March 21, 2005, meeting with the Union and Valeo officials, he made notes that "GM [is] in bigger trouble than we thought." (Roehrig Dep. at 128:23–24.) However, he also testified that there was no discussion at this meeting about a plant closing or a potential plant closing. (*Id*. at 132:8–11.) In addition, Roehrig was asked about his notes on a May 13, 2005, meeting with Valeo and others in Detroit, Michigan, at which Valeo again raised the option of filing bankruptcy, or the option to "go back to attrition bargaining with the union agreeing to pay a portion of it…, or … just refuse to negotiate" with the Union. (Roehrig Dep. at 138:2–7.) Although Roehrig conceded at his deposition that the Union could have gone on strike, (*id*. at 138:14–16), he said that as of the May 13, 2005, meeting, Valeo, "never threatened to shut down." (*Id*. at 139:5.)

Further, at his deposition, Plaintiffs' counsel specifically asked the following question and received the following answer from Roehrig:

Q. So they never said in March [2005], I'm not sure we're going to make it; I think we might close?

A. No, they never said that.

(*Id*. at 58:13–25.)

_____

[6]The time period for opting for the 2002 attrition program was January 1, 2005 through March 31, 2005. (Roehrig Dep. at 43:2–5.)

On the issue of whether Roehrig ever told any Union member that, "the incentive program was the best thing going," at deposition, he testified, "I never said that." (*Id*. at 51:5–7.) Regarding the possibility of future incentives, as it pertains to the Alonci Plaintiffs, Roehrig further testified concerning two kinds of questions he received: one being whether another incentive program was being discussed, and the other whether there was going to be a new incentive program for sure. (Roehrig Dep. at 52.) He said he responded to questions truthfully (*Id*. at 52–53): "If somebody asked if it [another incentive program] was going to be better I would say I have no idea." (*Id*. at 53:9–10.)

In any event, it is undisputed that the Union distributed to its membership a written Local 509 Bargaining Committee Update, dated March 17, 2005, which it prior to the date that the Alonci Plaintiffs could have withdrawn their elections to accept the RAP. In pertinent part the Update states:

> On March 11, 2005 Valeo management, (Walt Kneuere, John Siracusa, Dave Schweinfurth, Larry Petrone) met with the union bargaining committee, (Dave Roehrig, Mark Moochler, Perry Piccone, Maureen Terena) to discuss the state of the business and the future of the Rochester Site.…
>
> By the end of April the remainder of the people from the 2002 attrition program will be severed or have exit dates. We have been told that there is still a need to reduce 54 more production workers by the end of the year. I'd like to make something very clear; there is no way to reduce headcount other than layoff or termination once all of the agreed upon number of attrition people have left. You can't control layoffs, but you can make sure you're not terminated. Please watch your points and your steps of discipline. In 2006 we have been told the headcount numbers get worse. The overage will be determined after the RAP sign-up window closes. Management believes there are probably at least 100 additional reductions in headcount needed after the window closes. The corporation can't or won't support 150 employees on the SUB plan. After NY State unemployment is exhausted this cost is approximately $500 per week per employee or ($500 X 150 = $750,000). That is where our challenge comes

in. ***We are requesting another attrition program, but due to the costs Valeo has not been receptive to our ideas yet***.

Your union is committed to keep trying to find a way to protect every member of the bargaining unit. It won't be easy, and some people will be expected to leave earlier than they have originally planned in order to help lower seniority members. ***Also, what we come up with may very well be different than what we envision today***. ***We believe the process can evolve as we continue discussions and the union and management's needs become more apparent***.

(Roehrig Aff. Ex. G (Docket No. 55) at 27–28 (emphasis added).) A plain reading of the Update alerted the Alonci Plaintiffs that the Union was requesting another attrition program and that the 2002 RAP, which they accepted, could change in the future. Consequently, the Alonci Plaintiff's contention, that the Union made misrepresentations to them concerning the possibility of future attrition incentives, upon which they reasonably relied, is at odds with the evidentiary proof.

Once each Union member elected to sign up for the voluntary attrition program, he or she was required to sign a release, the contents of which included the following language:

This Program is completely voluntary. If you choose to participate in this voluntary Program, you should understand that the Company may adopt new or modified incentive or benefit provisions in the future that may be more or less advantageous to you than this Program. You should not expect or assume that any such future programs will be extended on a retroactive basis to anyone who participates in this voluntary Program.…

In exchange for the agreements and understandings made by the Company … I hereby release the Company and the Union, their parents, subsidiaries, divisions and affiliates and their respective officers, directors, employees and agents worldwide (the "Released Parties") from all rights, claims and causes of action of any nature whatsoever, whether known or unknown, fixed or contingent, occurring up to and including the date I sign this Agreement, which I or my heirs, executors, administrators or assignees may have against the Released Parties in connection with my employment by the Company or my termination and benefit entitlement under the terms

and conditions of the Program. This release applies to, but is not limited to, any claims of wrongful discharge and all grievances, rights and claims, to the fullest extent permitted by law, arising under federal, state or local laws prohibiting discrimination based on race, color, age, sex, national origin, religion, disability, veteran or marital status, sexual orientation or other forms of employment discrimination, including, without limitation, the Federal Age Discrimination in Employment Act of 1967, as amended ("ADEA"), the Employee Retirement Income Security Act, ("ERISA"), Title VII of the Civil Rights Act ("Title VII") , The Older Worker Benefit Protection Act ("OWBPA"), or claims arising out of any collective bargaining agreement between the Company and Union under federal labor law, or any other law regarding any legal restrictions on the Company's rights to terminate the employment of any of its employees.

(Fusco Aff. Ex. J (Docket No. 43-11) ¶ 1.A.) The release also contained a provision allowing its revocation by the Union member under conditions specified in that section as follows:

I have been encouraged to consult with an attorney, a financial advisor and family members before signing this Agreement. I have been provided at least forty-five (45) calendar days, at my option, to consider this Agreement, and shall have seven (7) working days from the date of its execution, and acceptance by the Company, and issuance of an approved exit date in which to revoke this Agreement. This Agreement will not be effective or enforceable against either me or the Company until after such seven (7) working day period has expired. If I elect to revoke this Agreement, this revocation shall be made in writing, and hand delivered to Loralyn Crozier or Mary Cay Hickey at the Company during regular business hours, during the revocation period noted on page 5 of this Agreement. Regular business hours are 8:00 am to 4:00 p.m. Eastern time, Monday through Friday. I understand that by my execution of this Agreement and my decision not to revoke the Agreement during the revocation period, I will be bound by the terms of this Agreement.

(*Id*. ¶ 4.) In addition, the release informed an employee that although he or she could indicate a preferred departure date, "the Company has the sole discretion to determine the actual effective date of my separation and my last day worked which may be different than my indicated preference." (*Id*. ¶ 1.B.) The Union contends that this release language was contained in both the 2000 and the 2005 Memoranda of Agreement that employees

seeking the retirement incentives had to sign. (Union Mem. of Law at 8.) The Alonci

Plaintiffs maintain that,

> As a result of the Union's dishonesty, each plaintiff was harmed financially given that he/she would have received far more money under the attrition programs obtained through the further bargaining and which were offered only months after each of the plaintiffs respective departure. (Plaintiffs' Aff., par. 23).

(Pl.s' Mem. of Law at 8.) The Zagari Plaintiffs maintain that,

> 1. The Union acted in bad faith in failing to undertake a proper investigation of the financial status of the company prior to agreeing and recommending various amendments to the Collective Bargaining Agreement, including but not limited to shortening the term of the agreement.

> 2. The Union acted in bad faith and without regard to its obligations to its membership as a result of the dwindled work force of approximately 510 hourly employees paying dues versus the approximately 3,500 hourly employees previously paying dues. As a result, the union shirked its responsibility to these plaintiffs and overtly lied to them regarding steps they took and options that they had.

> 3. The Union acted in bad faith and with deceit in withholding and/or in misrepresenting certain material facts to its members prior to holding the ratification vote for its most recent amendment to the CBA, such as, but not limited to the fact that they did nothing to ensure that the Rochester facility at least bid the contract that was awarded to Valeo's Mexico plant.

> 4. The Union acted in bad faith and with deceit in misrepresenting what options it had available to it prior to holding the ratification vote for the September, 2005 amendment to the CSA.

> 5. The Union acted in bad faith and with deceit by falsely stating prior to the vote, on many occasions, that it was and will remain a seniority shop and that the greatest benefits of the negotiation would flow to those with the greatest seniority.

> 6. The Union acted in bad faith and with deceit by negotiating the plant closure agreement without regard for its more senior employees despite its representations of being a seniority shop.

(Pl.s' Mem. of Law at 29–30.)

**STANDARDS OF LAW**

*Summary Judgment Standard*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non–moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S. Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

### *Duty of Fair Representation*

Section 301 of the National Labor Relations Act, 29 U.S.C. § 185, permits employees to sue the labor organization that represents them. The Second Circuit, in *Sim*

*v. New York Mailers' Union No. 6*, 166 F.3d 465 (2d Cir. 1999), described the plaintiff's burden of proof as follows:

> It is well-established that a union has a duty to represent fairly all union members in the negotiation of a collective bargaining agreement. *See Spellacy* [*v. Airline Pilots Association-International*], 156 F.3d [120] at 126 [(2d Cir. 1998)] (*citing* [*Air Line Pilots Ass'n v.*] *O'Neill*, 499 U.S. 65, 74, 111 S. Ct. 1127, 113 L. Ed. 2d 51). This duty "is implied under the scheme of the National Labor Relations Act." *White v. White Rose Food*, 128 F.3d 110, 113 (2d Cir. 1997) (*citing DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 164, 76 L. Ed. 2d 476, 103 S. Ct. 2281 (1983)). "A union breaches its duty of fair representation if its actions 'can fairly be characterized as so far outside a wide range of reasonableness . . . that [they are] wholly arbitrary, discriminatory, or in bad faith.'" *Spellacy*, 156 F.3d at 126 (alterations in original) (*quoting O'Neill*, 499 U.S. at 67). Bad faith requires a showing of fraudulent, deceitful, or dishonest action. *See Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 531 (10th Cir. 1992).

*Sim*, 166 F.3d at 472.

### Federal Rule of Civil Procedure 56(e)

A motion for summary judgment must be supported by evidentiary proof in admissible form, and the opponent may serve "opposing affidavits" before the hearing day. Fed. R. Civ. P. 56(c). "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.*

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.

Fed. R. Civ. P. 56(e). The jurat of an affidavit, "should show that the statements made in the affidavit were properly sworn to by the affiant before an authorized officer…" 2A

C.J.S. *Affidavits* § 29 (2009). Federal law permits unsworn declarations made under penalty of perjury to be considered as meeting the requirements of Rule 56(e), if, "subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: … 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).'" 28 U.S.C. § 1746(2) (1976); *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002).

The Court's guidelines provide the following with regard to signatures on electronically-filed documents:

> g. Signatures
>
> I. Non-Attorney Signature Generally. If the original document requires the signature of a non-attorney, the filing party shall obtain the signature of the non-attorney on the document.
>
> (1) The filing party or attorney then shall file the document electronically, or submit the document on disk to the Clerk's Office, indicating the signatory's name in the form "s/(name)."
>
> (2) A non-filing signatory or party who disputes the authenticity of an electronically filed document or the authenticity of the signature on that document must file an objection to the document within ten days of receiving the Notice of Electronic Filing.

United States District Court for the Western District of New York Administrative Procedures Guide (Dec. 2007) at 7.

## ANALYSIS

### Plaintiffs' Affidavits

Both the Alonci and Zagari Plaintiffs rely on a group affidavit. The Union argues that both group affidavits do not meet the requirements of Federal Rule of Civil Procedure 56(e). (Union's Reply Mem. of Law at 8–9.) One affidavit contains the name of

Rosetta Alonci below the signature line, with an indication that she signed the affidavit. Other signature pages follow Alonci's, all with the identical language, except for the name of the affiant. Following the affiant's signature line is one with "Notary Public" and an simple jurat which reads, "Sworn to before me this 13th Day of August, 2009." (Pl.s' Aff. (Docket No. 50-14) at 9.) Above the Notary Public signature line is a simple "/s/." The Zagari group affidavit also lacks any indication of a notary's name, and source or date of commission. The Union argues against the affidavits as follows:

> the affidavit signature page failed to include the signature of the name of the notary. The affidavits merely include a "/S/" over the signature line intended for the notary. Thus, the notary is never identified. Affidavits must be sworn to by [sic][7] an authorized person. *See* Federal Rule of Civil Procedure Rule 56(e); *see Local Union No. 49, United Rubber, Cork, Linoleum & Plastic Workers of America, AFL-CIO, v. Kirkhill Rubber Company*, 367 F.2d 956 ([9]th Cir. 1966).
>
> In addition, affidavits must be sworn to under penalty of perjury. *Brady v. Blue Cross and Blue Shield of Texas*, 767 F. Supp. 131 (N.D. Tx. 1991)[8]; *Henderson v. Clark Oil and Refining Corp.*, 639 F. Supp. 105 (N.D. Illinois 1986); *Inmates Washington County Jail v. England*, 516 F. Supp. 132 (E.D. Tenn. 1980).[9] Plaintiffs' affidavits were not sworn to under penalty of perjury. None of the affiants' statements were made under penalty of perjury. Plaintiffs' counsel included a certification, which certified that the document under the penalty of perjury. However, Plaintiffs' counsel has no personal knowledge of the statements contained therein, and therefore cannot swear as to the veracity of the statements in the affidavits.

(Union Reply Mem. of Law at 8.) The Union's argument that Plaintiffs' affidavits are not properly sworn is well taken. The affidavits do not meet the requirements of showing that

---

[7]The Ninth Circuit wrote, "not sworn to *before* an authorized officer." Local Union No. 490, 367 F.2d at 958 (emphasis added).

[8]"[A]n acknowledgment is not the equivalent of an affidavit." *Brady*, 767 F. Supp. at 135.

[9]"Neither can the complaint be considered as an affidavit. Although it is notarized, it is not verified under oath." *Inmates*, 516 F. Supp. at 138.

they were either in compliance with 28 U.S.C. § 1746, or show that the affiants swore before an authorized officer. However, at oral argument on October 22, 2009, Plaintiffs' Counsel handed to the Court properly notarized copies of the affidavits. The Court accepted the documents, and will directed that they be properly electronically filed to complete the record in this case.

***Alonci Plaintiffs***

The plaintiffs who are part of the Alonci group[10] of lawsuits ("Alonci Plaintiffs") all accepted a $75,000.00 cash buyout in 2005, since, at the time, none of them was eligible for the five year accelerated retirement benefit. The Alonci Plaintiffs argue that,

> [d]uring the Spring months of 2005, there were continual rumors circulating around the work place that Valeo and the Union were in continued talks in an effort to reach additional and enhanced exit packages for employees. Additionally, there were rumors that the union was aware that the company would be closing its Rochester facility imminently.

(Pl.s' Aff. ¶ 7.) The Alonci Plaintiffs have cited to numerous passages of the deposition testimony of Roehrig, which they contend support their fraud argument. However, the Court finds that the evidentiary proof, discussed above, does not support Plaintiffs' position as to Roehrig. Plaintiffs have submitted no evidence establishing that any Union official was aware of the possibility of plant closure prior to March 31, 2005, the end of their election period. In fact, the evidentiary proof previously detailed suggests the opposite. Moreover, even assuming, *arguendo*, that a Union official told each and every one of the Alonci Plaintiffs, as they allege, that "this was as good as it would get," they

---

[10]This group is comprised of the following plaintiffs: Rosetta Alonci, Slava Ayzenberg, Daniel Beachner, Luciano Castelli, Lisa Chiles, Jon Fanning, Stephen Farina, Roy Giunta, Joseph Imbergamo, Gilda Lucas, Sam Sciabbarra, Josephine Sigouin, Georgeann Straight, and Halya Temschenko.

could not have reasonably relied on such misrepresentation in the face of the March 17, 2005, Bargaining Committee Update. Finally, as to layoffs, the Court finds, based upon the deposition testimony of Roehrig quoted above, that he accurately represented there would be involuntary terminations if not enough people accepted the voluntary RAP.

Turning now to the Releases, the Alonci Plaintiffs argue that all the Releases signed are invalid based upon a theory of fraud in the inducement. In support of their argument, the Alonci Plaintiffs speculate that the Union was motivated to shrink the number of employees so the eventual spoils of negotiation would be divided among fewer people and that this was a breach of the Union's duty of fair representation.

First, it should be pointed out that the Union is included in each of the releases, even though it is not a signatory. *See Frommert v. Conkright*, 535 F.3d 111, 120 (2d Cir. 2008). The language in the release specifically states, "I hereby release the Company and the Union, their parents, subsidiaries, divisions and affiliates and their respective officers, directors, employees and agents worldwide…." (Release at 1.) In addition, the release defines the Union as: "the International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers/CWA, AFL-CIO, Local 509…." (*Id.*)

Next, under New York law "a party seeking to set aside a release on the grounds of fraud and misrepresentation must bear the burden of showing 'a material misrepresentation of fact made with knowledge of its falsity, with intent to deceive, justifiable reliance and damages.'" *Lillig v. Segal*, 220 A.D. 2d 724 (N.Y. App. Div. 2d Dep't 1995) (quoting *Mergler v. Crystal Props. Assocs.*, 179 A.D.2d 177, 181 (N.Y. App. Div. 1st Dep't 1992). In *Lillig*, the court also stated that,

It is well settled that a general release "is a jural act of high significance without which the settlement of disputes would be rendered all but impossible. It should never be converted into a starting point for renewal litigation except under circumstances and under rules which would render any other result a grave injustice" (*Mangini v McClurg*, 24 NY2d 556, 563). Further, "it is not a prerequisite to the enforceability of a release that the releasor be subjectively aware of the precise claim he or she is releasing" (*Mergler v Crystal Props. Assocs*., 179 AD2d 177, 180).

*Liling*, 220 A.D.2d at 725-26.

On March 29, 2005, Rosetta Alonci signed the Voluntary Attrition Program Agreement and General Release form, accepting the voluntary attrition program with a management-determined exit date of June 5, 2005. (Roehrig Aff. Ex. C at 11.) The Alonci Plaintiffs bear the burden of proving their contention that the Union was aware of a better deal to come and in that regard lied to them. In their group affidavit, the Alonci Plaintiffs state that during the spring of 2005, "there were continual rumors circulating around the work place that Valeo and the Union were in continued talks in an effort to reach additional and enhanced exit packages for employees" and that the Rochester plant would soon be closing. (Alonci Aff. ¶ 7.) Additionally, each of the Alonci Plaintiffs maintain that prior to signing the release, he or she inquired directly of "my Union representatives" about whether there was any truth to the rumors. (Alonci Aff. ¶ 9.) They further state that, "[t]he Union stammers and twists and turns…. However, this is the most important question of material fact present in this litigation. It is my *allegation* that the Union was in active discussion with the company concerning the addition of future attrition incentives and it lied to me upon my inquiry regarding the same." (Alonci Aff. ¶ 16 (emphasis added).) The Alonci group affidavit, though, does not identify the Union representative to whom any plaintiff spoke, or what, if anything, such representative specifically said in

response to the inquiry, or, for that matter, the timing of such inquiry in relation to the acceptance of the 2002 attrition program.[11] Plaintiffs' counsel states in her memorandum of law,

> In response to the plaintiffs' inquiries, Mr. Roehrig denied hearing anything from the company about possible plant closure and he denied that the union and the company were in any form of discussion or negotiation for enhanced/further severance packages other than for the 23 and out[12] negotiation. (*Id.*). This proved to be false as evidenced by Mr. Roehrig's own deposition testimony.

(Pl.s' Mem. of Law at 11.) The citation is a reference to the Alonci Group affidavit, paragraph 11. However, that paragraph does not address the issue argued in the memorandum of law, but rather reads in total as follows:

> 11. I can state without pause that I would have definitely remained in my employment and run the risk of layoff had I been made aware that talks were even going on between the Union and the company. I would have understood that there would be no assurance or guarantee that any further attrition incentives would occur, but based upon my investment in the company, my years of service and the great possibility of a better package especially if the company were to close, I would have absolutely remained in my employment.

(Alonci Aff. ¶ 11.)

Furthermore, to the extent the Alonci Plaintiffs rely on meeting notes taken by Roehrig to support their contentions regarding fraud in the inducement, the Court finds such reliance misplaced. The notes included in Plaintiffs' submission (Docket No. 50)

---

[11]What the affidavit states, in relevant part, is, "I decided that prior to accepting the benefits under the attrition program and signing the Release required to obtain the same, I would ask my Union representatives directly if there was any truth to the rumors." (Alonci Aff. ¶ 9.)

[12]Twenty-three-and-out refers to the Union's attempt to obtain a seven year service credit, thereby extending the existing 25-and-out retirement two additional years. On June 30, 2005, the Union's efforts were successful when General Motors Corporation agreed to honor the additional credited time. (Roehrig Dep. at 57:7–23.)

show a meeting with "John S., Dave S. Walt K., D. Roehrig and M. Moochler." (Docket No. 50-9 at 38.) J.S. is noted as saying that "Rochester may not be able to make money" and "Indicators are so good that France may tolerate." (*Id.*) One note shows, "Mark outsourcing products which are making money." Another shows, "Walt Next week on conference board items Attrition and other costs Legacy costs healthcare." (*Id.*) On the third page of the notes is an entry, "Walt GM in bigger trouble than we thought." (*Id.* at 40.) At the bottom of the third page of notes is, "7 year everyone would get to retire–go beyond 2013 eligibility capture 84, 85 seniority Need costs to go to 7 years." (*Id.*) The next set of notes in the exhibit date from March 21, 2005. No indication is made of who is meeting, or if the notes are only the musings of one person. They appear to be calculations of what it would cost to cover everyone with a pension, and end with these notes: "$20 – 30 million costs—How do we pay for that Mark How much left of the restructuring funds." (*Id.* at 41.) On the page numbered "00375" and marked as 42 of 46 in the docket for No. 50-9, are again notes accompanied by the names, Mark, Dave S., Walt, and John. The notes appear to be of a discussion of how to enlarge the pension to cover everyone: "Walt We do not need to dress up the old program, we need a new program." (*Id.* at 42.) The notes on the page following that one also appear to be of a discussion about how to expand the pension to a seven year window and avoid an early plant closing to give everyone a "soft landing (tier 4)." (*Id.* at 43.) Roehrig explained in his deposition that the "soft landing" comment meant, "[Valeo's] calculations, which were very similar to [the Union's], were that with seven years and the seniority in the plant right now and the credited service and age all considered, the majority of the people would be able to fall into one of the pensions." (Roehrig Dep. at 155:7–11.) On the following page

of notes, marked as "00377," are entries mentioning Mexico: "expanding test labs to Mexico 2/3 down there in the next five months." (*Id*. at 44.) The final two pages of notes mention bankruptcy with questions about the restructuring funds from the 2002 bankruptcy, and the 23 and out with an arrow pointing to the letters GM. (*Id*. at 45.)

The notes do not support the Alonci Plaintiffs' contention that the Union was in continued talks to obtain a better *severance* package from the Company to which they would have been entitled. At best, the notes verify what Roehrig said at his deposition: that there were negotiations to expand pension coverage to almost everyone.

After carefully reviewing the evidentiary proof in admissible form, the Court finds that Plaintiffs have not shown that Union representatives made a material misrepresentation of fact made, with knowledge of its falsity, with the intent to deceive, upon which they justifiably relied. Accordingly, the terms of the Voluntary Attrition Program Agreement and General Release signed by the Alonci Plaintiffs is a waiver of their claims in this lawsuit. Defendants' motion is granted.

### Zagari Plaintiffs

At oral argument on October 22, 2009, Plaintiffs' counsel conceded that in order for the Zagari Plaintiffs[13] to prevail, they would have to convince a jury that, but for the Union's misrepresentations to them, a majority of the 513 Union members who voted "yes" on the question of ratification of the 2005 agreement would have voted "no." There is no dispute that the vote for that agreement was 454 yes, and 59 no. (Roehrig Aff. Ex.

---

[13]This group is comprised of the following individuals: Daryl Bentley, Antonino DiLorenzo, Karen Eckert, Joanna Gadomski, Sebastian Gimeli, Jeffrey Giunta, Lillian Gucciardo, Alan Heim, Donald Merchant II, Randy Moore, Joseph Saiva, Stephen Schultz, Cosmo Uttaro, Michael VanPelt, and Vincent Zagari. (Pl.s' Mem. of Law at 16.)

J.) The Zagari Plaintiffs' argument is that were a jury to hear that the Union made misrepresentations to them, prior to the ratification vote, the jury could determine that a majority of Union members would have voted no as to the 2005 agreement. The Court disagrees and finds that Plaintiffs' argument consists merely of asking the factfinder to speculate that approximately 200 Union members would have voted no, instead of yes, to ratification of the 2005 agreement. Despite ample time for discovery, no evidentiary proof in admissible form has been presented to the Court to show that any members who voted yes, would, instead, have voted no. Furthermore, when queried by the Court, Counsel for the Zagari Plaintiffs could not come forward with any case law in support of their position.

## CONCLUSION

For the foregoing reasons, Defendants' motion is granted in its entirety. The Clerk is directed to enter judgment for Defendants with respect to the Alonci group of plaintiffs consisting of the following individuals: Rosetta Alonci, Slava Ayzenberg, Daniel Beachner, Luciano Castelli, Lisa Chiles, Jon Fanning, Stephen Farina, Roy Giunta, Joseph Imbergamo, Gilda Lucas, Sam Sciabbarra, Josephine Sigouin, Georgeann Straight, and Halya Temschenko.

Additionally, the Clerk is also directed to enter judgment for Defendants with respect to the Zagari group of plaintiffs, consisting of the following individuals: Daryl Bentley, Antonino DiLorenzo, Karen Eckert, Joanna Gadomski, Sebastian Gimeli, Jeffrey Giunta, Lillian Gucciardo, Alan Heim, Donald Merchant II, Randy Moore, Joseph Saiva, Stephen Schultz, Cosmo Vttaro, Michael VanPelt, and Vincent Zagari.

Further, Plaintiffs are directed to properly file the notarized affidavits to complete the record in this case.

IT IS SO ORDERED.

Dated: December 4, 2009
Rochester, New York       ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge